JOSE QUINTANA v. COMMISSIONER OF
CORRECTION
(AC 18421)

Landau, Schaller and Daly, Js.

Argued April 22—officially released October 26, 1999

*Norman A. Pattis*, for the appellant (petitioner).

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Robin Lipsky*, assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The petitioner, Jose Quintana, appeals from the judgment of the habeas court dismissing his amended petition for a writ of habeas corpus. The petitioner claims that the habeas court improperly determined that he was not entitled to a new trial. Specifically, the petitioner claims that the habeas court improperly failed to find that, at his trial, he was deprived of his constitutional rights (1) to due process of law, (2) to confront the witnesses against him and (3) to effective assistance of counsel. We affirm the judgment of the habeas court.

The following facts and procedural history are necessary to the disposition of this appeal. In 1987, a jury found the petitioner guilty of felony murder in violation of General Statutes § 53a-54c. The facts established at the petitioner's criminal trial, as reported in *State* v. *Quintana*, 209 Conn. 34, 36–37, 547 A.2d 534 (1988), are as follows: "The jury could reasonably have found

that on the evening of March 11, 1986, the victim, Robert Chrisman, was [fatally] stabbed in the chest on a sidewalk near his apartment in Waterbury. Police responding to a call reporting the incident found a silver-colored aluminum cigarette case and cigarette lighter on the sidewalk near the victim. The victim's fiancee, who later identified his body, testified that she did not recognize the lighter and cigarette case as belonging to the victim and had never seen them in his possession. The police officers at the scene collected the lighter and cigarette case and brought them to police headquarters for forensic examination. Police experts later determined that fingerprints on both of these items were the [petitioner's].

"The [petitioner's] former girlfriend, Jeannette Berman, testified that in a conversation with her two days after the stabbing incident, the [petitioner] admitted having stabbed the victim in self-defense in an altercation that, according to the [petitioner], had been initiated by the victim. She also identified the cigarette case and lighter that police had recovered from the crime scene as belonging to the [petitioner].

"Berman further testified that, a few days after the murder, she picked up the [petitioner] in her car at a prearranged meeting place pursuant to his instructions. As they drove around Waterbury, the [petitioner] ordered her to pull over to pick up a friend of his whom he saw walking nearby. She identified the passenger as Gregorio Hernandez, and testified that the [petitioner] and Hernandez subsequently carried on a conversation in Spanish in the back seat of her car while she drove.

"Hernandez testified at the [petitioner's] probable cause hearing and again at the trial that, during this back seat conversation, the [petitioner] confided in Hernandez that he had killed [the victim] during an

attempted robbery." On direct appeal, our Supreme Court affirmed the judgment of conviction.

Following the disposition of the petitioner's direct appeal, he instituted a habeas corpus proceeding. The relevant facts, as discussed in *Quintana* v. *Warden,* 220 Conn. 1, 3–4, 593 A.2d 964 (1991), are as follows: "The petitioner claimed before the habeas court that he had been denied effective assistance of counsel because his trial counsel failed adequately to cross-examine the state's principal witness and to investigate the petition-er's claim of self-defense.[1] Specifically, the petitioner argued that his attorney should have more thoroughly examined Hernandez on the issue of the reward money [from Crime Stoppers] and any arrangements he might have made with the police in return for testifying against the petitioner in consideration of leniency with respect to a weapons charge that was pending against him. The petitioner also claimed he had told his trial counsel that he had suffered a laceration on his back during the altercation with the victim, but that his trial counsel had failed to photograph the wound or to have a doctor examine it.

"The habeas court found that proof of the felony murder charge consisted principally of Hernandez' testi-mony, that the stabbing had occurred as an incident to a robbery, and that the petitioner's trial counsel had not aggressively cross-examined Hernandez concerning the reward money or his motives for testifying. Further-more, the habeas court found that the petitioner's trial counsel had not adequately investigated the petitioner's alleged injury and claim of self-defense and that such an investigation might have produced evidence that would have seriously undermined the state's case on the felony murder charge. The habeas court concluded

---

[1] The petitioner also raised a confrontation clause claim that the Supreme Court did not consider. *Quintana* v. *Warden,* supra, 220 Conn. 2 n.1.

that the appropriate standard for examining claims of ineffective assistance of counsel was set forth in *Strickland* v. *Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984), and that, under the *Strickland* test, the petitioner had demonstrated that he had not been adequately represented. The habeas court therefore granted the petition for a writ of habeas corpus and ordered a new trial." From that judgment, the state appealed to this court, and the appeal was thereafter transferred to the Supreme Court pursuant to Practice Book § 65-1. *Quintana* v. *Warden,* supra, 220 Conn. 4. Our Supreme Court concluded that the habeas court had applied an incorrect standard in reviewing the petitioner's claim of ineffective assistance of counsel, and reversed the judgment and remanded the case for a new hearing on the habeas petition. Id., 6.

Subsequently, the petitioner proceeded with this fourth amended petition containing four counts. The first and fourth counts allege a deprivation of the petitioner's right to counsel and actual innocence, respectively. The petitioner has abandoned both of those claims on appeal.

The second count alleges that the petitioner was deprived of his right to effective assistance of counsel. In support of this claim, the petitioner argues that he was ineffectively represented at trial by attorney Paul Yamin. The petitioner claimed that Yamin failed to investigate potential witnesses adequately and to pursue the petitioner's claim of self-defense. Hernandez testified that the petitioner had admitted to him that he had stabbed the victim during a robbery. The petitioner claims that Yamin failed to investigate the circumstances under which Hernandez' original statement was given to the police.

The third count, labeled "due process," alleges that the petitioner was deprived of his rights (1) to confront

the witnesses against him and (2) to exculpatory information. In support of this claim, the petitioner alleged that Hernandez contacted an agency in Waterbury known as Crime Stoppers prior to testifying at the petitioner's probable cause hearing and at trial. Hernandez was told by Crime Stoppers that he would receive money for his cooperation in prosecuting the charges against the petitioner if the petitioner was convicted. This arrangement was unknown to the petitioner or his attorney because of either Yamin's inadequate investigation, the Waterbury police department's failure to inform the state's attorney or the state's attorney's failure to inform the petitioner or his attorney. Following a hearing, the habeas court dismissed the petition. This appeal followed.

Central to all of the petitioner's claims is that Hernandez received compensation from Crime Stoppers in exchange for information regarding the victim's murder. The habeas court made extensive findings and conclusions as to Crime Stoppers, its relationship to the police department and the relationship between the department and Hernandez.

The habeas court found the following facts. Crime Stoppers is a civic organization with a civilian board of directors that aids local police departments in solving crimes. Crime Stoppers has a telephone number that rings at the police department where a police officer is assigned to be the "Crime Stoppers officer." The number is not connected to the department's switchboard.

Through local advertisements, citizens are encouraged to call Crime Stoppers to give information about unsolved crimes. When a person calls Crime Stoppers, he or she is given a code number by the officer and is told to call back at a later date to see whether the

information has led to an arrest. If such is the case, the caller is given a reward.

In addition to the Crime Stoppers officer, another officer is assigned Crime Stoppers duties. This is the "Crime Stoppers liaison officer." After acquiring information from the Crime Stoppers officer, the liaison officer meets with the Crime Stoppers board at its monthly meeting to report whether telephone calls have resulted in arrests. If so, the board votes to award the caller a cash reward, the amount of which depends on the seriousness of the crime. At the time of the stabbing in this case, arrests for murder usually warranted a reward of $1000. It is normal procedure for the president of the board to write a check and give it to the liaison officer who, in turn, cashes it and deposits the money at a drop-off point where it can be picked up by the caller.

The city of Waterbury supports the local Crime Stoppers group by paying the Crime Stoppers officer's salary as well as the cost of his office and telephone. Both the Crime Stoppers officer and the liaison officer are regular members of the police department whose duties are assigned by the superintendent of police. Their Crime Stoppers duties are within the scope of their duties as police officers.

Once the Crime Stoppers officer receives a telephone call and assigns the caller a code number, the officer completes a Crime Stoppers form that includes a summary of the proffered information. The original form is kept in the Crime Stoppers officer's office in a filing cabinet for which only he has the key, and a copy is sent to the relevant department division for action. Although the form is kept in the police department, it is not made a part of the department's official file. The copy sent to the department division may be discarded or returned to the Crime Stoppers officer. Because it

is generated by the Crime Stoppers officer, it is not considered to be a police document. Consequently, when the police file is turned over to the state's attorney, Crime Stoppers documents are not included.

The Crime Stoppers' standard operating procedure does not accurately reflect what happened in Hernandez' case. The habeas court's findings reveal that there was one person who provided information on the victim's murder and this person was given code number 368. The information was not brought to the attention of the Crime Stoppers officer through an outside telephone call, but instead, was transmitted to the officer by a member of the police department who had questioned Hernandez.

The Crime Stoppers officer prepared a report in the case, but completed only that portion of it that identified the names of the individuals arrested and the reward information. The reward information was provided to him by his supervisor. He stated that he did not complete the first eight lines of the form or its narrative portion. The form indicates that a murder occurred on March 11, 1986, and that a call was received on March 17, 1986. On the form, the petitioner and another individual, Blas Oliveras, were identified as suspects. The form also indicates that the information was referred to the detective division and that the petitioner and Oliveras were arrested and charged with felony murder. Next to the word "reward," "$1000" is written; next to the typewritten "date paid" is written "3/19/86." Above the "date paid" notation, "$200" is written, and next to an asterisk is written: "10/8/86 – $800 Back to Crime Stoppers (from [Detective Bureau] to Cap. Boyce) $800 paid 6/16/87 1300 Quality Auto Sales."

The narrative portion of the form reads as follows: "On 3/19/86 Chief of Det Bur notified Crime Stoppers that above caller 368 had contacted Det Bur on 3/17/86

and provided essential information, which was corroborated, providing the identity of murder suspects and enabling [police] to obtain and subsequently serve arrest warrants for two persons. In lieu of this and the additional fact that the caller would waive any right to anonymity and will be testifying in this matter—that caller should be entitled to the reward offered . . . . This request was subsequently presented to the chairman of Crime Stoppers board for his approval or denial."

At the habeas hearing, Hernandez testified that his statements were the product of police coercion, notwithstanding his prior testimony at the petitioner's probable cause hearing and trial as well as at Oliveras' trial. He testified that the police told him that he would be implicated in the murder if he did not give a statement. He identified the cigarette lighter and case only after the police said they belonged to the petitioner. He further testified that he had no knowledge of the murder and that his statement contains only facts told to him by the police. With respect to the reward, Hernandez stated that the police offered him money for his cooperation. He testified that he received $200 prior to the petitioner's trial and $800 after Oliveras' trial. He claimed that he was aware that he would receive the second installment only if he testified at the petitioner's trial. The habeas court, on the basis of its observations of Hernandez, as well as Hernandez' having admitted that he had committed perjury on three prior occasions, determined that his testimony, without corroboration, was untrustworthy.

With this in mind, the habeas court concluded that the police department investigative file reflects that the factual information given to detectives by Hernandez was consistent with his testimony at the probable cause hearing and at trial. The habeas court further found that the information Hernandez provided to detectives

was the information contained in the Crime Stoppers form. That court also found that Crime Stoppers authorized a $1000 reward, which was made available to the detective bureau, that $200 was paid to Hernandez and that $800 was subsequently returned to Crime Stoppers but was later paid to Hernandez. On the basis of the evidence adduced at the habeas hearing, the habeas court inferred that Crime Stoppers was contacted by unknown members of the police department who received $1000 and paid it to Hernandez in two installments. Finally, the habeas court determined that Hernandez was the person designated as number 368.

Yamin requested, by motion, all exculpatory information and material from the state. Information that Hernandez had been paid funds by members of the police department was within the department's possession. The state's attorney did not have knowledge of the payments made to Hernandez and, consequently, the information regarding the payments was not conveyed to the petitioner or his counsel. Additional facts from the habeas court's extensive findings will be set forth as they become relevant in the context of the petitioner's claims.

Before addressing the petitioner's claims, we set forth our standard of review of habeas corpus proceedings. "The underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. 'So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense.' *Townsend* v. *Sain*, 372 U.S. 293, 309 n.6, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963). Whether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. *Strickland* v. *Washington*, supra, 466 U.S. 698. As such, that question

requires plenary review by this court unfettered by the clearly erroneous standard." (Citation omitted.) *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 152–53, 662 A.2d 718 (1995). The remaining two constitutional claims made by the petitioner in this appeal also are mixed questions of fact and law warranting plenary review.

I

The petitioner first claims that the habeas court improperly failed to find that he was deprived at trial of his constitutional right to due process of law. Specifically, he claims that the habeas court should have found that he is entitled to a new trial because the state failed to disclose to him or his attorney the exculpatory and material fact that Hernandez was paid for his testimony. The crux of his argument is that because only Hernandez testified that the petitioner stabbed the victim while attempting to rob him, the result of his trial would have been different if the petitioner had been in possession of the information regarding the payments and was able, therefore, to use that information to impeach Hernandez. We disagree.

"The United States Supreme Court has held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [government]. *Brady* v. *Maryland*, [373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)]; *State* v. *Walker*, 214 Conn. 122, 126, 571 A.2d 686 (1990); *State* v. *Cohane*, 193 Conn. 474, 495, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984)[2] . . . . This type of violation of the defendant's due process rights is

_____

[2] In Connecticut, state's attorneys are obligated by statute to disclose such information regardless of whether a defendant makes a request. General Statutes § 54-86c.

commonly referred to as a *Brady* violation. *State* v. *Morales*, 232 Conn. 707, 714, 657 A.2d 585 (1995)." (Citation omitted; internal quotation marks omitted.) *State* v. *Connelly*, 46 Conn. App. 486, 512, 700 A.2d 694 (1997), cert. denied, 244 Conn. 907, 908, 713 A.2d 829, cert. denied, 525 U.S. 907, 119 S. Ct. 245, 142 L. Ed. 2d 201 (1998). "To prevail on a *Brady* claim, the defendant bears a heavy burden to establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material." (Internal quotation marks omitted.) *State* v. *Burke*, 51 Conn. App. 328, 333, 723 A.2d 327 (1998), cert. denied, 248 Conn. 901, 732 A.2d 177 (1999).

At the time of trial, the state's attorney did not have knowledge of the reward payment arrangement between Crime Stoppers, the police and Hernandez. Nevertheless, the state's attorney breached the duty to disclose. "Police are treated as an arm of the prosecution for *Brady* purposes, and the taint on the trial is no less if they, rather than the state's attorney, were guilty of the nondisclosure. . . . The State's duty of disclosure is imposed not only upon its prosecutor, but also on the State as a whole, *including its investigative agencies*. Therefore, if the [exculpatory materials] were held by the . . . police department we would be compelled to conclude that, constructively, the State's attorney had both access to and control over the documents." (Citations omitted; emphasis added; internal quotation marks omitted.) *Demers* v. *State*, 209 Conn. 143, 153, 547 A.2d 28 (1988). Because the habeas court's findings clearly show that the police department knew of the payment to the petitioner and that it did not disclose the information, we conclude that the petitioner has satisfied the first element of *Brady*.

We also conclude that the suppressed evidence would have been favorable to the petitioner's defense. Knowledge that Hernandez was paid for his testimony would

aid the petitioner in his attempt to impeach the witness. Moreover, our Supreme Court has recognized that "[i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." *State* v. *Monteeth*, 208 Conn. 202, 213, 544 A.2d 1199 (1988).

"The test of materiality of nondisclosed exculpatory evidence requires that there be a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . [W]here there is no reasonable probability that disclosure of the exculpatory evidence would have affected the outcome, there is no constitutional violation under *Brady*. . . . *State* v. *McIntyre*, 242 Conn. 318, 323–24, 699 A.2d 911 (1997). [T]he mere possibility that an item of undisclosed evidence might have helped the defense or might have affected the outcome . . . does not establish materiality in the constitutional sense." (Internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 311, 715 A.2d 1 (1998).

The habeas court found substantial consistencies between the testimony of Berman, the petitioner's former girlfriend, and that of Hernandez.[3] Both testified that the petitioner admitted that he had stabbed the victim to death on the evening of March 11, 1986, on Cherry Street. Both testified that the petitioner had waited outside a grocery store that he had seen the victim enter. The stabbing took place when the victim left the store. Both Berman and Hernandez testified that Hernandez had been picked up in a car a few days after the stabbing by another girl and the petitioner. While in the car, the petitioner conversed with Hernandez. Both witnesses identified the cigarette case and

---

[3] The habeas court admitted as exhibits the entire transcript of the petitioner's criminal trial.

lighter found at the scene of the crime as being the petitioner's. Even if the petitioner had the benefit of the suppressed material at his trial, these consistencies would serve to bolster the credibility of Hernandez' testimony.

The habeas court also noted, as we did previously, that the only significant inconsistency between the testimony of Berman and that of Hernandez related to the stabbing itself. Hernandez testified that the petitioner told him that he stabbed the victim in an attempted robbery, while Berman testified that the petitioner told her that the victim had stabbed him or struck him with an object that cut his hand and wounded his shoulder, and that he then stabbed the victim in self-defense. Courts have found that improperly withheld impeachment evidence is not material where the testimony of the witness who might have been impeached is strongly corroborated by additional evidence supporting a guilty verdict. See, e.g., *United States* v. *Risken*, 788 F.2d 1361, 1375 (8th Cir.), cert. denied, 479 U.S. 923, 107 S. Ct. 329, 93 L. Ed. 2d 302 (1986) (testimony of informant sought to be impeached "was strongly corroborated by the tape recordings of his conversations with appellant"). Hernandez' version is corroborated by and consistent with the evidence, while Berman's is inconsistent with it.

No knife or other sharp object was found on or near the victim. The habeas court found that the petitioner never offered any credible evidence that he had sustained defensive wounds at the hands of the victim. We note that the petitioner testified at the habeas hearing that one of the wounds he suffered in the alleged altercation with the victim bled for four months after the incident. The petitioner's attorney, however, testified that he never was shown or told of such wounds. Furthermore, the petitioner's medical screening form, prepared by the booking officer and signed by the

petitioner seven days after the incident when the petitioner was initially incarcerated, indicates that the petitioner was not "bleeding" or suffering from any "abnormalities of the skin that warranted medical attention." In addition, at trial, the state presented forensic evidence of abrasions to the face and body of the victim. This, along with the stab wounds on the victim, was consistent with Hernandez' testimony that the petitioner told him that the petitioner and Oliveras beat the victim before stabbing him.

Further corroboration of Hernandez' testimony with respect to the circumstances of the stabbing is that both Berman and Hernandez testified that the petitioner told them that he waited outside the store for the victim. This fact is consistent with the version given by Hernandez in that it provides lying in wait evidence compatible with an act of attempted robbery.

Finally, the record shows that the petitioner exhibited consciousness of guilt inconsistent with a theory of self-defense. In a telephone conversation with Berman the day after the crime, the petitioner said he was not living at home but was moving around and staying in different places. The petitioner told Berman that the police would never take him alive. In addition, prior to his arrest, the petitioner called Berman and asked if he could see her one more time before he left the area.

The fact that Hernandez was compensated by Crime Stoppers for his involvement in this case should have been made known to the petitioner. Because the only part of his testimony that is inconsistent with Berman's is substantially corroborated by other evidence, we conclude that there is not a reasonable probability that, had the information been conveyed to the petitioner, the result of his trial would have been different. Accordingly, the petitioner's claim must fail.

## II

The petitioner claims next that the habeas court improperly failed to find that he was deprived at trial of his constitutional right to confront the witnesses against him. Specifically, the petitioner argues that because he did not receive the information regarding Hernandez' compensation, he was deprived of his right to cross-examine Hernandez adequately and that he is therefore entitled to a new trial. This claim lacks merit.

The right of an accused to confront witnesses against him is guaranteed by the sixth amendment to the United States constitution[4] and article first, § 8, of the constitution of Connecticut.[5] "A significant aspect of the right of confrontation is the cross-examination of adverse witnesses to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the [witnesses]. . . . Because the core value protected by the confrontation clause is the enhancement of the truth-seeking process . . . [c]ross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." (Citations omitted; internal quotation marks omitted.) *State* v. *Monteeth,* supra, 208 Conn. 209. The confrontation clause, however, is implicated only "when there [is] a specific statutory or court-imposed restriction at trial on the scope of questioning. . . . The right to cross-examine witnesses does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront

---

[1] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[5] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." (Citation omitted; internal quotation marks omitted.) *State* v. *Harris*, 227 Conn. 751, 764, 631 A.2d 309 (1993).

The information at issue here was not withheld pursuant to statute. Furthermore, our review of the record does not reveal any court imposed restriction on the petitioner's questioning of Hernandez on the issue of compensation. Although the petitioner was entitled to the nondisclosed information, as discussed in part I of this opinion, the nondisclosure was not a constitutional violation. The petitioner was not deprived of his right to confront the witnesses against him.

### III

The petitioner claims finally that the habeas court improperly failed to find that he was deprived of his constitutional right to effective assistance of counsel. We are not persuaded.

On appeal, the petitioner bases his claim on the pretrial investigation, or the alleged lack thereof, by his trial counsel. The petitioner argues that, but for certain inadequacies on the part of Yamin, the result of his trial would have been different. In support of his claim, the petitioner relies, inter alia, on the habeas testimony of his expert, Attorney William Bloss. As the petitioner recites in his brief, Bloss testified at the habeas hearing that Yamin violated the standard of care among criminal defense counsel by his "total failure to investigate" the state's case, by deciding what defense to employ without conducting an investigation and by never seeking to interview alleged eyewitnesses to the crime. Bloss further testified that it was inconceivable that the petitioner's counsel would make no effort to speak to Hernandez. He testified that counsel's failure to do so

resulted in the failure to discover the payment arrangement between Hernandez, Crime Stoppers and the police.

The petitioner also makes the following arguments in support of his claim. He asserts that Yamin did not hire a private detective and that his investigation consisted of a telephone call to Berman and a conversation with Oliveras' attorney. Although counsel discovered a statement in the state's file given by one man claiming that another man was involved in the stabbing and also that two black men were seen running from the scene,[6] Yamin did not contact any of these individuals. Further, Yamin knew that the petitioner's claim that he was involved in an altercation was a pivotal issue, yet he failed to file a motion in limine to limit the use of police photographs used by the state to support the claim that the petitioner was not injured in a struggle with the victim. Yamin conceded that there was a danger these photographs would be prejudicial to the petitioner.

The habeas court made the following relevant findings. At the time of the petitioner's trial, Yamin had been in practice approximately seventeen years and had tried several criminal cases to verdict, including one felony murder case. Calculated by income, criminal defense work represented about 30 percent of his effort.

Yamin testified credibly at the habeas hearing. Noting that cooperative clients' statements will often lead to beneficial avenues for further investigation, his first line of inquiry was with the petitioner. The petitioner was, however, uncooperative. He appeared to be distrustful of him and the criminal justice system and provided very little useful information. Yamin met several times with the petitioner prior to his trial. Counsel stated that the petitioner was perhaps the most difficult criminal

---

[6] The petitioner is not black.

defendant he had represented because of his unwilling-ness to speak with him and to assist in his defense.

The petitioner admitted that he had been involved in the stabbing but claimed that he had been attacked first. He neither denied nor acknowledged attempting to rob the victim. Counsel learned from Berman the details of the petitioner's claim that the victim accosted him with a sharp object. Yamin also spoke with counsel for Oliveras and reviewed the state's attorney's file. With respect to certain witnesses whose statements were given to police and about whom statements were made, counsel did not attempt to contact these individu-als because he concluded that their statements were inconsistent with the petitioner's claims.

The state offered the petitioner a plea bargain con-sisting of a twenty-five year sentence. Against his attor-ney's advice, he refused, stating that he would agree only to a sentence of six years.[7] Yamin had no recollec-tion of any claim by the petitioner that he had been wounded in an altercation with the victim, nor did he recall seeing any wounds on the petitioner. Further-more, the public defender who initially represented the petitioner did not give Yamin any such information.

Yamin did not conduct an extensive investigation of Hernandez. He did, however, obtain information about Hernandez from another attorney and was aware of the names of individuals who could offer testimony about him.[8] Yamin was unaware that Hernandez was paid for his testimony. If he were aware of that fact, he would have used it to impeach Hernandez. Counsel did request any and all exculpatory information in this case. Yamin did attempt to discredit Hernandez' trial testimony that he was not coerced by police into making his statement

---

[7] The petitioner was eventually sentenced to fifty years.

[8] Yamin called one of the individuals at trial, but he declined to testify on the basis of his right not to incriminate himself.

by bringing out an inconsistency in Hernandez' testimony at the probable cause hearing, namely that police had told him that if he did not cooperate he might be implicated in the crime.

The standard to be applied in determining whether an attorney has represented a criminal defendant effectively is set forth in *Strickland* v. *Washington*, supra, 466 U.S. 668. "In order for a criminal defendant to prevail on a constitutional claim of ineffective assistance of counsel, he must establish both (1) deficient performance, and (2) actual prejudice. . . . Thus, he must establish not only that his counsel's performance was deficient, but that as a result thereof he suffered actual prejudice, namely, that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . In this context, a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different, does not require the petitioner to show that counsel's deficient conduct more likely than not altered the outcome in the case. . . . Rather, it merely requires the petitioner to establish a probability sufficient to undermine confidence in the outcome." (Citations omitted; internal quotation marks omitted.) *Bunkley* v. *Commissioner of Correction*, 222 Conn. 444, 445–46, 610 A.2d 598 (1992) (en banc).

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland* v. *Washington*, supra, 466 U.S. 691. "Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Id., 693. Rather, a defendant must show that there is a reasonable probability that

the errors affected the outcome of the proceeding. Id., 694. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id., 689.

We conclude first that Yamin's failure to contact the individual who made a statement to the police and the individual who was mentioned in the statement did not constitute deficient performance. In light of the petitioner's admission of stabbing the victim, counsel did not need to investigate statements that someone else was involved in the stabbing as they were inconsistent with the petitioner's own version of events.

Yamin's conduct relative to the issue of the wounds allegedly suffered by the petitioner at the hands of the victim did not constitute deficient performance. The petitioner did not tell counsel directly that he had suffered any such wounds. Also, no mention of any wounds was made in the police investigative reports nor was any information to that effect relayed to Yamin by the public defender who initially represented the petitioner. Furthermore, the petitioner's medical screening form, prepared by the booking officer and signed by the petitioner, indicates that the petitioner was not "bleeding" or suffering from any "abnormalities of the skin that warranted medical attention." As the habeas court concluded, "There is no factual basis to support the petitioner's claim that he sustained any wounds in the 'altercation' with the victim."

We also note that the general statement by the petitioner's expert that Yamin totally failed to investigate the state's case is at odds with the record. Yamin spoke with the petitioner, his girlfriend and counsel for Oliveras as well as the public defender who initially handled the petitioner's case. He also reviewed the state's

files, including the investigative reports, and made the proper discovery requests. Furthermore, counsel made an informed choice on whether to investigate certain individuals mentioned in the file.

We address finally the alleged deficient performance of Yamin with respect to his pretrial investigation of Hernandez. For purposes of this discussion, we assume, without deciding, that counsel's conduct was deficient in this regard, but conclude that the petitioner has failed to establish that the conduct created a reasonable probability that the outcome of his trial would have been different. The petitioner argues that, had counsel adequately investigated Hernandez, he would have discovered that Hernandez was compensated and that this information would have altered the outcome of his trial. Because the standard for proving *Strickland*'s second prong of an ineffective assistance of counsel claim is equivalent to the standard of materiality encompassed in a *Brady* claim; see *Kyles* v. *Whitely*, 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); referring to our discussion in part I of this opinion, we conclude that the petitioner has failed to establish actual prejudice.

The judgment is affirmed.

In this opinion the other judges concurred.